HOME INSURANCE COMPANY *v.* AETNA LIFE AND CASUALTY COMPANY
(15051)
(15052)

Callahan, Borden, Norcott, Katz and Palmer, Js.

Argued June 1—decision released August 15, 1995

*Lois B. Tanzer*, with whom, on the brief, was *Donald W. O'Brien*, for the appellant in Docket No. 15051 (plaintiff's judgment debtor).

*Joseph A. O'Brien*, with whom, on the brief, was *Edward W. Case*, for the appellant in Docket No. 15052 (defendant).

*William F. Gallagher*, with whom, on the brief, were *Cynthia C. Bott* and *Roger B. Calistro*, for the appellee in both cases (plaintiff).

PALMER, J. These certified appeals arise out of litigation stemming from a fire started by Barry Schuss on August 15, 1983, that caused extensive damage to the Emanuel Synagogue in West Hartford. The plaintiff, Home Insurance Company (Home), which was the synagogue's insurer, obtained a judgment against Schuss and, thereafter, brought this subrogation action against the defendant, Aetna Life and Casualty Company (Aetna), the insurer of Schuss' parents. After the trial court, *Hodgson, J.*, had denied Home's motion for

access to certain of Schuss' psychiatric records, Aetna filed a motion for summary judgment. Home opposed Aetna's motion on the ground that a genuine issue of material fact existed concerning the applicability of an exclusion in Aetna's policy for property damage arising from an insured's intentional misconduct. The trial court, *Gordon, J.*, granted Aetna's motion for summary judgment and rendered judgment thereon.

Home appealed to the Appellate Court, claiming that the trial court improperly had: (1) denied its request for access to Schuss' psychiatric records; and (2) granted Aetna's motion for summary judgment. The Appellate Court agreed with both of Home's claims and, accordingly, reversed the judgment of the trial court. *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 35 Conn. App. 94, 644 A.2d 933 (1994).

We granted Schuss' petition for certification to appeal, limited to the issue of whether the Appellate Court properly concluded that Home was entitled to access to his psychiatric records. We also granted Aetna's petition for certification to appeal, limited to the issue of whether there existed a genuine issue of material fact concerning the applicability of the policy exclusion in the circumstances of this case.[1] We conclude that the trial court properly denied Home's motion for access to Schuss' psychiatric records and properly

---

[1] We granted Schuss' petition for certification to appeal limited to the following question: "Under the circumstances of this case, did the Appellate Court properly conclude that the psychiatric records of Barry Schuss were disclosable under General Statutes § 52-146f (5)?" *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 231 Conn. 921, 648 A.2d 163 (1994). We granted Aetna's petition for certification to appeal limited to the following question: "Under the circumstances of this case, did the Appellate Court properly reverse the trial court's summary judgment on the ground that [there] was a sufficient question of fact regarding whether Barry Schuss intended to cause damage, within the meaning of the defendant's policy exclusion?" Id.

The two appeals have been consolidated for presentation to this court.

granted Aetna's motion for summary judgment. We therefore reverse the judgment of the Appellate Court.

The facts and procedural history relevant to this appeal are set forth in the opinion of the Appellate Court. "This is a subrogation action to recover an amount paid by [Home] for damages caused by a fire at the Emanuel Synagogue in West Hartford. The fire was set by Barry Schuss who pleaded guilty to arson in the third degree in violation of General Statutes § 53a-113 (a).[2] Schuss' parents are insured by [Aetna].

"[Home], as the insurer and assignee of the Emanuel Synagogue, paid its insured $696,539.71 for the damage caused by the fire and commenced an action against Schuss to recover the amount paid. As a special defense, Schuss initially pleaded that he had been 'exposed to various experiences in his personal life so as to result in a growing psychological vulnerability [and] . . . his loss of a substantial ability to control himself.' Schuss later withdrew the special defense, and the court rendered judgment, in accordance with a stipulation, against Schuss for $696,539.71 plus interest. [Home] and Schuss stipulated that [Home] would seek to satisfy the judgment only to the extent that Schuss had insurance coverage.[3]

"[Home] then commenced a subrogation action against [Aetna], the insurer of Schuss' parents, to recover the amount of the judgment obtained against Schuss.[4]

[2] General Statutes § 53a-113 (a) provides in relevant part: "A person is guilty of arson in the third degree when he recklessly causes destruction or damage to a building . . . of his own or of another by intentionally starting a fire or causing an explosion."

[3] The trial court had granted Home's unopposed motion for summary judgment on the issue of liability. Thereafter, Home and Schuss stipulated to damages. The stipulation provided, inter alia, that Home would "seek to satisfy its judgment against the defendant Barry D. Schuss only to the extent the defendant has insurance coverage."

[4] General Statutes § 38a-321 provides in relevant part: "Upon the recovery of a final judgment against any person, firm or corporation by any person

[Aetna] did not deny that Schuss qualified as an insured under a general liability policy it issued to Schuss' parents. [Aetna], however, pleaded as a special defense that it had no obligation to pay the judgment because Schuss' conduct of August 15, 1983, fell within an exclusion of the policy's coverage. The exclusion provides that the insurer is not liable for property damage 'which is expected or intended by the insured.'

"[Home] filed an application for an order pursuant to General Statutes § 52-146f for the release of certain confidential psychiatric records of Schuss.[5] [Home] claimed that [Aetna's] special defense made Schuss' mental condition an issue in the case. The trial court denied [Home's] application on the ground that [Aetna], not Schuss, introduced Schuss' mental condition as an issue in the case. The court also concluded that under the principles of subrogation [Home] held the contractual rights of Schuss but not his personal rights such as the privilege of confidentiality.

. . . for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment."

[5] Home has never disputed that the psychiatric records it seeks are confidential and, therefore, protected from disclosure under General Statutes §§ 52-146d and 52-146e. See footnotes 6 and 7. Home claims, nevertheless, that it is entitled to access to Schuss' psychiatric records under § 52-146f, which provides in relevant part: "Consent not required for disclosure, when. Consent of the patient shall not be required for the disclosure or transmission of communications or records of the patient in the following situations as specifically limited . . . (5) Communications or records may be disclosed in a civil proceeding in which the patient introduces his mental condition as an element of his claim or defense, or, after the patient's death, when his condition is introduced by a party claiming or defending through or as a beneficiary of the patient and the court or judge finds that it is more important to the interests of justice that the communications be disclosed than that the relationship between patient and psychiatrist be protected. . . ."

"After the denial of the plaintiff's application, [Aetna] filed a motion for summary judgment, claiming that Schuss' plea of guilty to arson in the third degree conclusively established that he intended to cause damage to the synagogue, which would prevent him from being covered by the insurance policy. After the trial court denied the motion, [Aetna] filed a second motion for summary judgment, contending that statements made by Schuss in a deposition of December 18, 1990, indicated that he intended or expected to damage the synagogue, which allegedly would trigger the application of the policy exclusion. The trial court granted this motion for summary judgment on the ground that there was no evidence before the court 'except that which indicates Schuss intended to start the fires and do damage.' " Id., 95–98.

Home appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court improperly had: (1) denied Home's application for an order releasing Schuss' psychiatric records; and (2) granted Aetna's motion for summary judgment. The Appellate Court reversed on both issues, concluding that "[a]lthough the patient, Schuss, introduced his mental condition in [Home's] action against Schuss, and not in [Home's] action against [Aetna] . . . the actions are one and the same because the action against Schuss is the underlying action to the subrogation action against [Aetna]." Id., 99. Having determined that Schuss had, in effect, placed his mental condition at issue in Home's subrogation action against Aetna, the Appellate Court concluded that Home was entitled to access to Schuss' psychiatric records pursuant to § 52-146f (5); id., 99–101; and that the issue of whether Schuss had "expected or intended" to cause damage to the synagogue within the meaning of the insurance policy's intentional act exclusion clause was a question of fact to be decided by the jury. Id., 101–107. Accordingly, the Appellate Court

reversed the judgment of the trial court. This appeal followed.

On appeal to this court, Schuss claims that the Appellate Court incorrectly concluded that Home is entitled to access to his psychiatric records under § 52-146f (5), and Aetna claims that the Appellate Court improperly concluded that there existed a genuine issue of material fact regarding the applicability of the exclusion in its policy for property damage intentionally caused by an insured. We agree with both of these claims and, accordingly, we reverse the judgment of the Appellate Court, and reinstate the judgment of the trial court.

I

Home acknowledges that Schuss' psychiatric records fall within the ambit of General Statutes § 52-146e,[6] which establishes the confidentiality of communications and records relating to the psychiatrist-patient relationship. See General Statutes § 52-146d.[7] Home posits three

---

[6] General Statutes § 52-146e provides: "Disclosure of communications. (a) All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative.

"(b) Any consent given to waive the confidentiality shall specify to what person or agency the information is to be disclosed and to what use it will be put. Each patient shall be informed that his refusal to grant consent will not jeopardize his right to obtain present or future treatment except where disclosure of the communications and records is necessary for the treatment.

"(c) The patient or his authorized representative may withdraw any consent given under the provisions of this section at any time in a writing addressed to the person or office in which the original consent was filed. Withdrawal of consent shall not affect communications or records disclosed prior to notice of the withdrawal."

[7] General Statutes § 52-146d provides in relevant part: "Privileged communications between psychiatrist and patient. Definitions. As used in sections 52-146d to 52-146i, inclusive . . .

"(2) 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's

arguments, however, in support of its claim that it nonetheless is entitled to access to Schuss' psychiatric records.[8] First, Home maintains that because Schuss placed his mental condition at issue in Home's action against Schuss by asserting the special defense of " 'psychological vulnerability [and] . . . loss of a substantial ability to control himself,' " Schuss' psychiatric records are disclosable to Home pursuant to § 52-146f (5). Second, Home contends that as the subrogee of Schuss' rights under Aetna's insurance policy, pursuant to § 38a-321; see footnote 4; Home itself is empowered to waive the confidentiality of Schuss' records. Third, Home claims that the stipulation entered into by Home and Schuss imposed on Schuss an implied obligation not to frustrate Home's efforts to collect from Aetna on the judgment it had obtained against Schuss. We are not persuaded.

A

Under § 52-146f (5), communications or records that are otherwise subject to the psychiatrist-patient privilege under § 52-146e "may be disclosed in a civil proceeding in which the patient introduces his mental condition as

mental condition between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility;

"(3) 'Consent' means consent given in writing by the patient or his authorized representative . . .

"(6) 'Patient' means a person who communicates with or is treated by a psychiatrist in diagnosis or treatment;

"(7) 'Psychiatrist' means a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry, or a person reasonably believed by the patient to be so qualified."

[8] We certified only the first of the three claims raised by Home in support of its argument that it is entitled to disclosure of Schuss' psychiatric records. Home has raised the remaining claims as alternate grounds for affirmance pursuant to Practice Book § 4140.

an element of his claim or defense."[9] Although Home concedes that Schuss has not introduced his mental condition as an element of his defense in *this* case, Home maintains that nonetheless it is entitled to Schuss' psychiatric records because Schuss did place his mental condition at issue in *Home's action against Schuss.*[10] In support of its interpretation of § 52-146f (5), Home argues that the Appellate Court correctly concluded that "under the principles of subrogation, a party that obtains a judgment against an insured defendant is substituted in place of the defendant for the purposes of an action against the insurer on the insurance policy. . . . This principle of substitution links the action against the insured and the subsequent subrogation action against the insurer to such an extent that they can be regarded as one cause of action." (Citations omitted; internal quotation marks omitted.) *Home Ins. Co.* v. *Aetna Life & Casualty Co.,* supra, 35 Conn. App. 99–100. We do not agree.

Home's argument is contrary to the plain language of § 52-146f (5), which expressly limits disclosure of psychi-

[9] Under § 52-146f (5), the party seeking access to the privileged communications must also establish that "it is more important to the interests of justice that the communications be disclosed than that the relationship between patient and psychiatrist be protected." See footnote 5. The Appellate Court concluded that Home had satisfied this requirement; see *Home Ins. Co.* v. *Aetna Life & Casualty Co.,* supra, 35 Conn. App. 101; and Schuss has contested that determination. We need not reach this issue, however, because we conclude that § 52-146f (5) is inapplicable in the circumstances presented.

[10] Schuss contends that even if Home's action against him could be considered the same as this action for purposes of § 52-146f (5), Home is not entitled to access to his psychiatric records because Schuss withdrew his special defense in the action brought by Home against him and, furthermore, Home never sought to obtain the records in that action. Schuss argues, therefore, that to the extent he had placed his mental condition at issue in the earlier action, he had removed the issue from the case when he withdrew his special defense. Home, on the other hand, claims that once Schuss introduced his mental condition into the case, Home had a right to obtain Schuss' psychiatric records regardless of the fact that Schuss later withdrew his special defense. In light of our conclusion that § 52-146f (5) does not apply to this action, we do not reach this issue.

atric records to those civil proceedings in which the patient has introduced his mental condition as an element of his defense. Had the legislature intended to authorize a subrogee to obtain a subrogor's confidential psychiatric records in a subrogation action wherein the subrogor is not a party, the legislature easily could have done so. See *Howard* v. *Commissioner of Correction*, 230 Conn. 17, 22, 644 A.2d 874 (1994); *Caulkins* v. *Petrillo*, 200 Conn. 713, 719, 513 A.2d 43 (1986). We will not impute to the legislature an intent that is not apparent from unambiguous statutory language in the absence of a compelling reason to do so.

We find nothing in the legislative history of §§ 52-146e and 52-146f, or their precursor, General Statutes § 52-146a, to suggest that the legislature intended the result urged by Home. As we have previously observed, "[t]he people of this state enjoy a broad privilege in the confidentiality of their psychiatric communications and records"; *State* v. *D'Ambrosio*, 212 Conn. 50, 55, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); and the principal purpose of that privilege is to "give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy which could result from a doctor's testimony." *State* v. *White*, 169 Conn. 223, 234–35, 363 A.2d 143, cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975). Accordingly, the exceptions to the general rule of nondisclosure of communications between psychiatrist and patient were drafted narrowly to ensure that the confidentiality of such communications will be protected unless important countervailing considerations require their disclosure. See, e.g., 9 H.R. Proc., Pt. 8, 1961 Sess., p. 3945, remarks of Representative Nicholas B. Eddy (statutory scheme " 'defines the protected relationship carefully and at the same time recognizes the legitimate interest of society in intruding upon the relationship *in*

*certain limited situations* . . . [reading from a letter submitted by Eugene Rostow, then dean of the Yale Law School]; if the *patient himself* raises the issue of his mental condition, *in any claim against him or any claim he may make*—it should be open to *his [adversary]* to go into the communications between the psychiatrist and himself' " [emphasis added]; see also Conn. Joint Standing Committee Hearings, Judiciary and Governmental Functions, Pt. 2, 1961 Sess., pp. 867–68, remarks of Harold Wright; 9 S. Proc., Pt. 8, 1961 Sess., pp. 2888–93, remarks of Senator Florence D. Finney. We see no reason to conclude, therefore, that the legislature intended the result urged by Home.

We are not persuaded, moreover, that Home's subrogation claim against Aetna is, in effect, the same action as Home's claim against Schuss for the purpose of § 52-146f (5). The principle of substitution in subrogation actions refers not to the relationship between the underlying claim and the subrogation action but, rather, to the substitution of the subrogee for the subrogor. Indeed, the right to subrogation does not depend on the existence of any earlier litigation. See *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, 123 Conn. 232, 238, 193 A.2d 769 (1937) ("[subrogation] is a legal fiction through which one who, not as a volunteer or in his own wrong and where there are no outstanding and superior equities, pays the debt of another, is substituted to all the rights and remedies of the other").

Furthermore, the claims underlying Home's action against Schuss and its action against Aetna are completely different: the former was brought as a common law trespass action, and the latter as a statutory subrogation action involving the scope of an insurer's liability coverage under an insurance policy. Because the claims are separate and distinct, the facts to be proven in satisfaction thereof are also different. Finally, although the two actions were commenced by the same plaintiff, each

involves a different defendant who is not a party to the other action. Thus, the fact that the two actions have their origins in the same event does not transform them into one proceeding.

Although neither the Appellate Court nor Home cite any authority for the proposition that § 52-146f (5) applies to a subrogation action in which the subrogor seeking to protect the confidentiality of his or her psychiatric records is not a party, Home relies generally on *Goldenberg* v. *Wolfe*, 44 F.R.D. 33 (D. Conn. 1968), to support its claim. In *Goldenberg*, the plaintiff sued her attorney for legal malpractice for his handling of a case in which the plaintiff's mental condition was an issue. Although the trial court in *Goldenberg* concluded that the plaintiff's psychiatric records were disclosable under § 52-146f (5), its conclusion was not based upon any connection between the two cases but, rather, because the plaintiff, in initiating the second action, thereby had placed her mental condition at issue. Here, Schuss is not a party to the second action and, therefore, Home cannot claim that Schuss has placed his mental condition at issue as required by § 52-146f (5).

In sum, Home's claim finds no support in the language of § 52-146f (5), the pertinent legislative history, the policy underlying the psychiatrist-patient privilege or any precedent. We conclude, therefore, that Home is not entitled to access to Schuss' psychiatric records under § 52-146f (5).

B

Home next asserts that § 38a-321, which subrogates a judgment creditor to the rights of his or her debtor against the debtor's insurer, authorized Home to waive the confidentiality of Schuss' psychiatric records.[11] This

---

[11] Because the Appellate Court agreed with Home's first argument, it did not consider any of Home's other claims.

argument misperceives the reach of our subrogation statute.

Under § 38a-321, a party who obtains a judgment against an insured defendant "shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant . . . could have enforced his claim against such insurer had such defendant paid such judgment." Thus, § 38a-321 authorized Home to assert any claim or defense that Schuss himself could have raised had Schuss himself brought suit against Aetna. We repeatedly have stated, however, that the "intention of the [statute] is to give to the [judgment creditor] the same rights *under the policy* as the assured . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Brown* v. *Employers' Reinsurance Corp.*, 206 Conn. 668, 672, 539 A.2d 138 (1988), quoting *Guerin* v. *Indemnity Ins. Co.*, 107 Conn. 649, 653, 142 A. 268 (1928); see also *Verdon* v. *Transamerica Ins. Co.*, 187 Conn. 363, 369, 446 A.2d 3 (1982). Because Schuss' right to maintain the confidentiality of communications with his psychiatrist arises under § 52-146e and not under his contract of insurance with Aetna, § 38a-321 does not empower Home to waive Schuss' privilege. Although Home was entitled, of course, to raise the claim that Schuss did not intend to cause damage to the synagogue when he set it afire, Home's assertion of such a claim does not also entitle it to access to Schuss' psychiatric records.

In effect, Home urges us to construe § 38a-321 as creating an exception to a psychiatric patient's right to confidentiality under § 52-146e. See *Skrzypiec* v. *Noonan*, 228 Conn. 1, 9–10 n.6, 633 A.2d 716 (1993) (reserving question of whether disclosure of otherwise confidential psychiatric records was authorized by Workers' Compensation Act). We decline to do so because we are unable to find any support for Home's

claim either in the relevant statutory language or legislative history. In light of the public policy favoring the confidentiality of communications that fall within the ambit of § 52-146e, we will not engraft an exception onto the privilege established thereunder in the absence of persuasive evidence that such an exception was intended by the legislature.

Home cites *State* v. *White*, supra, 169 Conn. 223, in support of the claim that the legislature intended to empower a subrogee to waive its subrogor's psychiatrist-patient privilege. In *White*, we concluded that General Statutes (Rev. to 1981) § 19-492 (c),[12] since repealed, established a specific exception to the psychiatrist-patient privilege in the case of a criminal defendant who had been ordered to receive drug treatment as a condition of his probation. In *White*, we based our determination on the statutory scheme governing the confinement and treatment of drug dependent persons, and in particular § 19-492 (c), which required the court, inter alia, to determine whether a probationer had satisfied the terms and conditions of a court-ordered treatment program. As we stated in *White*, "§§ 52-146d [through] 52-146j establish a general privilege, while § 19-492 (c) specifies instances, such as we have here, in which such a privilege may not be invoked. . . . [S]pecific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling." (Internal quotation marks omitted.) Id., 232–33. Application of this principle of statutory construction to the present case defeats Home's claim: the specific, narrowly tailored exception to the psychiatrist-patient priv-

---

[12] General Statutes (Rev. to 1981) § 19-492 (c) provided: "No physician or staff member of any facility for the treatment and rehabilitation of drug-dependent persons pursuant to this chapter who submits any report or files any petition authorized by this chapter shall be held to have violated any otherwise confidential relationship."

ilege embodied in § 52-146f (5) prevails over the general subrogation provisions of § 38a-321.

Finally, our conclusion is consistent with one of the primary purposes underlying the enactment of §§ 52-146e and 52-146f, namely, to give "the patient control over who gets his records." 13 H.R. Proc., Pt. 9, 1969 Sess., p. 4191, remarks of Representative Robert G. Oliver. The statutory construction urged by Home would remove such control from the patient-subrogor by permitting the subrogee to waive the patient's privilege without regard to the patient's desire to maintain the confidentiality of his or her psychiatric communications and records. Because we are not persuaded that the legislature intended such a result, we reject Home's claim.

C

Home's final argument is that the stipulation it entered into with Schuss carried with it an implied covenant that Schuss would take no action detrimental to Home's subrogation claim against Aetna. Schuss' efforts to block the release of his psychiatric records, Home maintains, violated this implied covenant. We do not agree.

Home argues that because Schuss knew that Home would proceed against Aetna under § 38a-321 after having obtained a judgment against Schuss, Home "justifiably expected to obtain all the records of Schuss necessary to prosecute its subrogation action." In the circumstances, however, Home's expectation that it would be able to obtain Schuss' psychiatric records gave rise to no legally cognizable right in Home to gain access to those records. We have stated that "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other *to receive the benefits of the agreement.*" *Habetz* v. *Condon*, 224 Conn. 231,

238, 618 A.2d 501 (1992); see also *Warner* v. *Konover*, 210 Conn. 150, 154–56, 533 A.2d 1138 (1989). Home, therefore, reasonably may argue that Schuss, in entering into the agreement with Home, impliedly promised not to do anything to frustrate Home's right to receive the benefit to which it was entitled under the stipulation, namely, to obtain a judgment against Schuss on the issue of damages. Home has identified no conduct by Schuss, however, including Schuss' efforts to bar the release of his psychiatric records, that could be said to run afoul of any such covenant of good faith and fair dealing.

There is further reason to reject Home's claim. Whatever contractual obligation Home claims Schuss had to assist Home in its litigation against Aetna, that obligation, in the absence of an explicit agreement between the parties, cannot extend to Schuss' statutory right to maintain the confidentiality of his psychiatric records. To conclude otherwise would allow Home to obtain access to Schuss' confidential psychiatric communications without demonstrating either that the records were available under a recognized exception to the psychiatrist-patient privilege or that Schuss himself expressly had consented to the release of the records. In view of the strong public policy in favor of the confidentiality of psychiatric communications, it cannot be presumed that Schuss' agreement to a stipulated judgment on the issue of damages also represented his consent to the release of the records in question. See *State* v. *Toste*, 178 Conn. 626, 629–30, 424 A.2d 293 (1979) (waiver of privilege not effective unless knowing and intelligent). Furthermore, Schuss consistently has taken the position that his psychiatric records are confidential and not subject to release.[13] We will not, therefore,

[13] For example, there are indications in Schuss' April, 1988 deposition that Schuss withdrew his special defense to avoid the release of the records under § 52-146f (5). Moreover, Schuss refused Home's request that he release the records voluntarily, and he opposed Home's efforts to obtain the records

read into the stipulation a provision requiring Schuss to waive his privilege against the disclosure of his confidential psychiatric records.

## II

Aetna claims that the Appellate Court improperly concluded that the trial court should not have granted Aetna's motion for summary judgment. We agree.

The standard of review of a trial court's decision to grant a motion for summary judgment is well established. Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 384. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotations marks omitted.) *Water & Way Properties* v. *Colt's Mfg. Co.*, 230 Conn. 660, 664–65, 646 A.2d 143 (1994). Only

during the pendency of Home's action against Aetna. In fact, at Schuss' deposition in December, 1990, Schuss' counsel repeatedly objected to questions regarding Schuss' thought processes at the time of the fire "because [Home has] been trying throughout to get into [Schuss'] psychiatric records and we are not opening any doors in that [regard]."

evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. See Practice Book § 381.

In support of its opposition to Aetna's summary judgment motion, Home offered as evidence the special defense, later withdrawn, asserted by Schuss in Home's action against him, as well as Schuss' deposition testimony.[14] We conclude that the trial court properly rejected Home's claim that Schuss' special defense is admissible in this case.[15] We also conclude that the trial court correctly found that Schuss' deposition testimony was not sufficient to defeat Aetna's motion for summary judgment.

We turn first to Home's argument that Schuss' assertion of a special defense empowered Home to use that defense for the purpose of establishing a factual basis for its claim that Schuss did not intend to cause damage to the synagogue and, consequently, that Schuss' conduct falls outside the provision in Aetna's policy excluding from coverage any property damage intentionally caused by its insured. Although assertions in pleadings generally are inadmissible as hearsay, "[s]tatements in pleadings that are inconsistent with claims advanced at trial are admissible as judicial admissions." *Schenck* v. *Pelkey*, 176 Conn. 245, 248, 405 A.2d 665 (1978). Furthermore, "a superseded pleading remains in the case

---

[14] Schuss was deposed by Home on April 29, 1988, December 18, 1990, February 11, 1992, and May 18, 1992.

[15] Accordingly, Schuss' psychiatric records also are not available to Home under § 52-146f (5). See part I A of this opinion. Had Home prevailed on its claim that Schuss' assertion of his special defense in Home's action against Schuss authorized Home to obtain Schuss' psychiatric records in its action against Aetna, those records might have supported Home's claim that Schuss had not intended to cause damage to the Emanuel Synagogue within the meaning of the intentional act exclusion clause of Aetna's policy. Home conceded at oral argument, however, that without access to Schuss' psychiatric records, the evidence available to oppose Aetna's summary judgment motion was "very thin."

as a part of its history and is available to the adverse party as an admission." Id.; see also C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 6.7.1 ("evidentiary distinction between operative pleadings and superseded pleadings should never be overlooked"). Home claims, therefore, that Schuss' special defense, though later withdrawn, is admissible as the admission of a party opponent. Evidence of the judicial admission of Schuss is not admissible in this action, however, because although Schuss' judicial admission might be admissible *against* Home as Schuss' subrogee, it could not be used *by* Home against Aetna.[16] Consequently, the only admissible evidence offered by Home in opposition to Aetna's summary judgment motion was Schuss' deposition testimony.

Home advances two arguments in support of its position that Schuss' deposition testimony raised a sufficient issue of material fact to have defeated Aetna's summary judgment motion. First, Home claims that the testimony created a doubt as to Schuss' credibility regarding his intent to cause damage to the synagogue. Second, Home contends that Schuss' deposition testimony is sufficient to permit an inference that Schuss lacked the soundness of mind to have intentionally caused damage to the synagogue. We are not persuaded by either of these arguments.

Our careful review of Schuss' deposition testimony reveals that Schuss testified consistently and unequivocally that he had intended to set fire to the Emanuel Synagogue for the purpose of damaging it.[17] Indeed,

---

[16] We need not consider the question of whether Aetna could, by virtue of Home's status as Schuss' subrogee, use Schuss' special defense as an admission against Home.

[17] In ruling on the defendant's motion for summary judgment, the trial court, *Gordon, J.*, considered only Schuss' deposition testimony. As the Appellate Court noted, this evidence, contrary to Home's claim, "showed that Schuss intended and expected to cause damage to the synagogue. Schuss' statements in his deposition of December 18, 1990, established that when

Home does not allege otherwise. Home claims, however, that because Schuss was able to recall certain events more clearly when he was deposed in 1992 than when he was originally deposed in 1988, his credibility is suspect. This claim, however, is not substantiated by the deposition testimony. Schuss' 1992 testimony, though more complete, is entirely consistent with his 1988 testimony. Furthermore, nothing in Schuss' later deposition testimony reasonably may be construed to cast doubt on the credibility of his statements that he intended to set the fire and to cause damage to the synagogue.

In addition, when Schuss was asked whether he had been able to control his actions when he set the fire, Schuss stated that he was in control and that, had he wanted to, he could have stopped himself. Further, Schuss' testimony that he had wanted to "caus[e] trouble" by setting the fire and that he was fearful only about getting caught clearly indicates that he was aware of the wrongfulness of his actions. Home has produced no evidence to the contrary.

We have not had occasion to decide the question of how an insured's mental condition may affect the application of an insurance policy's intentional act exclusion clause.[18] We need not consider this issue,

he started the fire he expected and hoped to burn down the structure." *Home Ins. Co* v. *Aetna Life & Casualty Co.*, supra, 35 Conn. App. 102–103.

[18] Noting that Connecticut has not yet considered the question, the Appellate Court stated that "other jurisdictions have determined that the conduct of an insured is not intentional for the purposes of an intentional act exclusion where the insured lacks a certain mental capacity." *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, supra, 35 Conn. App. 103. The Appellate Court thereafter concluded that "the mental condition of an insured may affect the application of a policy's intentional act exclusion clause"; id., 106; and enumerated the following tests that have been adopted in other jurisdictions "for determining whether the insured's mental incapacity bars the application of an exclusionary clause . . . . Under one test, an insured's actions are not considered intentional where a derangement of the insured's intellect deprived him of the capacity to control his actions in accordance with reason, and, while

however, because we conclude that Home has failed to adduce any evidence to establish that Schuss did not intend to cause damage to the Emanuel Synagogue when he set it ablaze.[19] Consequently, a jury reasonably could not have concluded that Schuss' conduct in setting the fire fell outside the exclusion contained in Aetna's policy for intentional property damage caused by an insured. Accordingly, the trial court properly granted Aetna's motion for summary judgment.

The judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.

suffering from that condition, he acted on an irrational impulse. . . . Under another test, an insured's actions are considered intentional where, although he cannot appreciate the wrongfulness of his conduct, he understands the nature and consequences of his actions and intends to cause injury. . . . Under a third test, an insured's actions are not considered intentional where, because of mental illness or defect, the insured does not appreciate the wrongfulness of his conduct, or is deprived of the capacity to control his actions regardless of his understanding of the wrongfulness of his action. . . ." (Citations omitted.) Id., 105–106. The Appellate Court then adopted the last test. Id., 106–107.

[19] Accordingly, the defendant cannot prevail under any of the tests used in determining whether an insured's conduct is intentional for the purposes of an insurance policy's intentional act exclusion clause. See footnote 18. We express no view as to the standard adopted by the Appellate Court.