[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
Metropolitan Life Insurance Company ("Met Life") is a large mutual insurance company that insured employee health care plans of various manufacturers and distributors of asbestos and products containing asbestos. From 1976 to 1986, the defendants, The Travelers Indemnity Company and The Travelers Insurance Company (collectively "Travelers"), sold primary, umbrella and first-layer excess comprehensive general liability insurance policies to Met Life. During the same period, Travelers and the remaining defendants sold excess liability insurance policies to Met Life. None of the excess liability policies provide coverage for underlying claims unless and until an amount equal to the total annual coverage provided by the underlying Travelers policies ($25 million) is exhausted.
Beginning in the 1970s and continuing to the present time, Met Life has been named as a defendant in thousands of lawsuits filed throughout the United States seeking recovery for asbestos-related bodily injuries resulting from Met Life's alleged failure to publicize adequately the health risks of asbestos exposure. These underlying claims refer to a period of time beginning in the 1930s when Met Life engaged in medical research activities. Certain reports and articles were generated either by or under the direction of Dr. Anthony Lanza, Met Life's Assistant Medical Director.
To date, approximately 200,000 claims against Met Life have CT Page 5109 been filed; half of them have been settled, at a "nuisance value" averaging about $2500 per claim. The underlying claims themselves basically allege that Dr. Lanza, and therefore Met Life, knew or should have known of the hazards of asbestos exposure though the research activities and failed to warn the public by publication of the results of those studies. There are also claims that Met Life distorted or misstated the results in various articles and reports. Many of the underlying claimants are industrial, shipyard and construction workers who are not Met Life policyholders or persons who worked in asbestos plants where Met Life performed studies. Rather, liability is predicated on the claim that Met Life assumed a duty to disclose to the general public when it undertook its research on asbestos.
The underlying claimants allegedly suffered bodily injuries resulting from exposure to asbestos over a period of several years. In paying the settlement sums in addition to its defense costs, Met Life has expended hundreds of millions of dollars in connection with this litigation and anticipates substantial expenditures in the future.
Met Life filed the present lawsuit against the defendants, all excess liability carriers, seeking declaratory relief and damages for breach of contract. In the first count, this court is requested to enter a declaratory judgment determining that: a) the defendants are liable to pay in full Met Life's defense costs and all sums Met Life has paid, or may become legally obligated to pay, as damages with respect to the underlying claims; and b) the plaintiff is entitled to designate the policy years called upon to provide such payments. In the second count, Met Life alleges that the defendants have breached or will breach the contractual obligations set forth in the excess policies.
The defendants have filed motions for summary judgment on various issues: 1) number of occurrences; 2) allocation; 3) breach of contract; and 4) professional services exclusion. The parties all agree that New York and Connecticut are the only jurisdictions which have colorable interests in the resolution of the issues in this case. They also agree that with respect to the issues of allocation, the meaning of the term "occurrence" in the excess liability policies and the meaning of the "professional services" exclusion, there is no conflict between New York and Connecticut law. There is, therefore, no need to perform a choice of laws analysis. CT Page 5110
"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotation marks omitted.) Home Ins. Co. v. Aetna Life Casualty Co.,235 Conn. 185, 202-203, 663 A.2d 1001 (1995). "A `material' fact has been defined adequately and simply as a fact which will make a difference in the result of the case." Catz v. Rubenstein,201 Conn. 39, 48, 513 A.2d 98 (1986)
Number of Occurrences
This motion for summary judgment was filed by Home Insurance Company and City Insurance Company (collectively "Home") and was joined by American Centennial Insurance Company and Forum Insurance Company. The remaining defendant insurers are not involved in this particular motion. Plaintiff and the moving defendants all agreed, at the time of argument on this motion, that this issue is appropriate for summary judgment.
The Home insurance policies all provide a stated dollar amount of insurance on a "peroccurrence" basis, and are in excess of Travelers coverage of $25 million per occurrence. In other words, none of the Home excess policies attach to Met Life's alleged liability until it has exhausted $25 million of underlying insurance for each "occurrence". Consequently, the moving defendants would be entitled to summary judgment unless it can be shown that Met Life has paid or will pay damages in the amount of $25 million per occurrence in any policy year.
The Home policies follow form to the Travelers umbrella policies. For example, Home policy HXL-1 57 42 26, for the period CT Page 5111 from January 1, 1984 to January 1, 1985, provides as follows:
FOLLOWING FORM ENDORSEMENT
 Such insurance as is afforded by this policy is following form and excess of Travelers Insurance Co. Policy #T-CUP-107T598-5-83 hereinafter called underlying policy is warranted to the exact terms and conditions of the underlying policy, except with respect to limits of liability and premium and all preprinted terms and conditions herein are deleted to the extent that they vary or are inconsistent with the terms and conditions of the underlying policy.
The Declarations Page of this excess liability policy indicates that the underlying insurance policy is the above-referenced Travelers policy (umbrella policy) and that the "Applicable Limit" is "$25,000,000. Each Occurrence."
The Travelers umbrella policy, in Section I entitled "Coverage", undertakes to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages in excess of the retained limit because of bodily injury, personal injury, advertising injury or property damage to which this policy applies." Section VI of the subject umbrella policy, entitled "Limits of Liability", provides in relevant part as follows:
 With respect to any occurrence for which insurance is afforded hereunder, . . . the company's liability is limited as described below.
 1. The total liability of the company for all damages, including damages for care and loss of services, as the result of any one occurrence shall not exceed the limit of liability stated in the declarations as applicable to "each occurrence". For purposes of determining the limit of the company's liability and the retained limit, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
Alleged "bodily injury" resulting from exposure to asbestos would be the event during the policy period which triggers liability for Met Life. Because the provisions of the excess CT Page 5112 policies limit the damages to those in excess of $25 million per occurrence, determination of the number of occurrences becomes critical to the possibility of recovery by Met Life.
The defendants claim that Connecticut and New York law require that each underlying claim for which Met Life seeks coverage from the defendants must be treated as a new and separate occurrence. They maintain that the exposure to asbestos is the defining event, i.e., the last link or act in the causal chain, for a "number of occurrences" analysis. On that basis, Met Life has not and will not incur sufficient liability on a "per occurrence" basis to implicate any of the defendants' policies.
According to the plaintiff, neither the Travelers umbrella policies (which the Home policies incorporated) nor the Home policies at issue define the term "occurrence". The "Limits of Liability" provisions of the Travelers umbrella policies, however, do contain a "batch clause"[1]. The plaintiff claims this court must look to the cause of Met Life's liability in the underlying claims. On that basis, it argues that there is a single occurrence, i.e., its alleged failure to publicize adequately the health risks of asbestos exposure. Given this common cause and the "batch clause" in met Life's policies, Met Life requests a finding of a single occurrence as a matter of law.
Connecticut has very little case law addressing this precise issue. In a superior court decision, Mohawk Mountain Ski Area.Inc. v. American Home Assurance Co., No. CV #056905 (January 30, 1995), the policy had no generic definition of"occurrence" and did not specify what events constituted an occurrence. In deciding a motion to set aside a verdict, Judge Pickett concluded that the damage caused by two tornadoes striking at separate times within a 45 minute period at separate locations could not, as the defendant argued, be considered a single occurrence as a matter of law.
There are a number of New York courts, however, ruling on this issue and interpreting the term in policies with and without definitions of "occurrence". The two leading cases are StonewallIns. Co. v. Asbestos Claims Management Corp. , 73 F.3d 1178 (2d Cir. 1995), reh'g denied, 85 F.3d 49 (2d Cir. 1996) and DiCola v.American Steamship Owners Mutual Protection Indemnity Assoc.,Inc., 158 F.3d 65 (2d Cir. 1998) ("Prudential Lines"). InStonewall, numerous issues were presented concerning liability CT Page 5113 insurance coverage in the context of claims for personal injury and property damage arising from exposure to asbestos. The principal issue was the determination of the relevant time period or periods for which liability insurance coverage was available to a former asbestos product manufacturer confronted with thousands of asbestos-related claims, where the policies at issue were triggered not by the operation of a claim against the insured but by the occurrence of bodily injury or property damage during the policy period. The definition of "occurrence" contained in the subject policies was "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury. . . ." Id., 1192. The District Court held that all the asbestos-in-building claims arose out of a single occurrence, which was the insured's decision to manufacture and sell asbestos-containing building materials. The Second Circuit Court of Appeals disagreed.
In determining the number of occurrences, New York inquires whether multiple claims result from "an event of an unfortunate character that takes place without ones foresight or expectation." (Emphasis in original.) Id., 1213. Although a single occurrence may give rise to multiple claims, courts should look to the event for which the insured is held liable, not some point further back in the causal chain. Id., 1213. The Court concluded that the case law of New York was consistent with the policy language in the case before it; the "accident" was not the insured's decision to manufacture asbestos but rather was the installation of the asbestos-containing building materials. For each installation, there was a new exposure and another occurrence. Id., 1213.
In Prudential Lines, the Trustee of a shipping line in bankruptcy (Prudential) sued Prudential's insurer seeking declaratory relief clarifying that insurer's indemnity obligations for asbestos-related bodily injury claims asserted against Prudential. The subject policies provided that personal injury claims were subject to a deduction in a stated amount "with respect to each accident or occurrence", but provided no definitions for the terms "accident" and "occurrence". The District Court found the term to be ambiguous; the Second Circuit Court of Appeals disagreed. Quoting from Newmont Mines Ltd. v.Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986), it noted that "[t]he term `occurrence' ordinarily is understood to denote `something that takes place', especially `something that happens unexpectedly and without design'. Accordingly, the PrudentialCT Page 5114Lines Court reasoned that "[t]he presence of asbestos aboard a vessel cannot be said to take place, any more than in a slip and fall aboard ship the slippery deck can be said to be happening . . . The unfortunate event causing personal injury is the exposure of people." Id., 79. "Under New York law, multiple injuries are grouped as a single `occurrence' when they arise out of the same event of unfortunate character and occur close in time with no intervening agent." Id., 81.
The Court in Prudential Lines noted that the claimants sought to hold Prudential liable for bodily injury and "the last link in the causal chain leading to Prudential's liability for bodily injury was exposure to asbestos. Each claimant was separately exposed to asbestos at different points in time. Therefore, the injuries arise from multiple occurrences." Id., 81. Liability attached following the first exposure; each claimant's first exposure in the policy period was the final unfortunate event which caused injury, gave rise to the policyholders potential liability, and triggered the policy. Each claimant's later exposures were but a continuation of the same occurrence. Id., 82-83.
The critical issue in this motion for summary judgment on the issue of the number of occurrences is whether an omission, i.e., an alleged failure to publicize adequately the dangers of asbestos exposure, which began at some point in the 1930s and continues to the present time, can be considered a single occurrence for purposes of coverage under the excess liability policies. Under the plaintiff's theory, the bodily injuries suffered by the claimants arise out of the "continuous or repeated exposure to substantially the same general conditions [the failure to warn over a sixty year period]. . . ." Thus, in accordance with the "batch clause" in the policies, it claims there is but one occurrence.
The plaintiff can cite no case law which approximates the situation at hand. It is difficult to characterize this pattern of behavior or conduct or inactivity as an "accident", "event" or "condition" which constitutes a single occurrence. It is, rather, a course of conduct spanning decades. Moreover, the injuries did not occur close in time. The court is faced with a situation in which, according to the plaintiff, there is a single occurrence or, according to the defendants, there are separate occurrences for each underlying claim. No middle ground has been presented. Although most courts addressing the issue of the number of CT Page 5115 occurrences have approached it as an issue of fact, and this court would have given due consideration to such an argument, the parties in this case expressly stated that the number of occurrences issue was appropriate for summary judgment. The parties argued that this issue needed to be determined as a matter of law and this court must decide this matter upon the issues as presented; it is not the function of this court to speculate as to an alternate theory. "We have not yet reached a jurisprudential stage where we require trial judges to be mentally telepathic. (Citations omitted.) To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." Baker v. Cordisco, 37 Conn. App. 515, 522,657 A.2d 230 (1995).
Faced with these choices, the court is confident that a course of conduct spanning many decades is not a single "occurrence" as that term is used in the subject policies. There is absolutely no case law to support such a proposition. If not a single occurrence, the court's only other option is to find that there are multiple occurrences. This court concludes, therefore, that an alleged failure to publicize adequately the dangers of asbestos exposure does not meet the criteria set forth in theStonewall and Prudential Lines cases for the finding of a single occurrence. With respect to the bodily injuries referenced in the underlying claims, the last link in the causal chain is the exposure to asbestos and not the alleged failure to publish the results of studies undertaken in the 1930s and thereafter. The "event of unfortunate character" which must "occur close in time with no intervening agent" must be, as found to be in thePrudential Lines case, each claimant's separate exposure to asbestos; the injuries arise from multiple occurrences.Prudential Lines, supra, 81.
The plaintiff argues that such a reading of the policy language effectively negates coverage under excess liability policies which were specifically written to insure against massive losses such as these. This court is not persuaded as a matter of pure social policy that catastrophic insurance was ever meant to cover losses for a collection of underlying lawsuits of dubious merit, no matter how great in number, which are being settled individually for nuisance values.
For these reasons, the court finds as a matter of law that each underlying claim for which Met Life seeks coverage from the CT Page 5116 defendants must be treated as a separate occurrence.
Allocation
The defendants claim that when a claimant's injury spans a number of years and the insured is unable to prove what portion of injury occurred during the policy periods, injuries or damages should be allocated on a pro rata basis to all periods in which injury or damage took place. Allocation would be made to the insured for those periods when it either did not purchase insurance or it purchased insufficient amounts of insurance coverage. The plaintiff argues that because the excess liability policies contain an "all sums" clause,[2] and lack a proration clause, an excess liability insurance company cannot limit its obligations to a pro rata share or portion of the policyholder's liability.
There is no appellate case law on the issue of allocation in the State of Connecticut. Fortunately, there are two recent superior court decisions, Reichhold Chemicals, Inc. v. HartfordAccident Indemnity Co., No. X03-CV-88-0085884-S (October 1, 1998) (Reichhold I) and Reichhold Chemicals, Inc. v. HartfordAccident Indemnity Co., No. X03-CV-88-0085884-S (February 11, 1999) (Reichhold II), which address this issue. Applying New York law to the issue of allocation of damages, Judge Aurigemma noted in Reichhold I that courts in New York have repeatedly rejected the proposition that an insurer is "jointly and severally" liable for the entire amount of pollution damage, regardless of how much damage takes place during the insurer's policy period[3]. In the absence of evidence warranting a different allocation, covered damages will be allocated pro rata based on the time the insurer was on the risk. Judge Aurigemma concluded: "Because only excess insurers remain as defendants in this case, Reichhold's `pick and choose' theory allows it to stack all the damages in the covered year and avoid having to exhaust all of its primary (or first-dollar) coverage for all years. Reichhold's view on allocation reads out of the policy the requirement that damage take place during the policy period — a construction that is contrary to New York's and Connecticut's rule of contract interpretation." Id., 18.
The plaintiff argues that Stonewall did not squarely address the allocation issue and further indicates that the PrudentialLines case had not yet been decided at the time Judge Aurigemma wrote her opinion. Judge Aurigemma reiterated her conclusion on CT Page 5117 the issue of allocation in Reichhold II, however, which was decided months after the Prudential Lines case. In Reichhold II, the court again cited the Stonewall case and rejected the argument that the "all sums" language in the policies mandated a conclusion of joint and several liability. Judge Aurigemma specifically addressed the Prudential Lines decision: "Reichhold's reliance on that case is misplaced because the decision was specifically limited to its unique facts and did not change existing New York law in any way." Id., 21.
The policies in Stonewall contained the "all sums" language found in the excess liability policies issued to Met Life. The term "occurrence" was defined in Stonewall as "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury. . . ." Id., 1192. As to the point in time when the "bodily injury" occurred within the meaning of the policies so as to "trigger" coverage, the Court noted: "[Under New York law], a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became [diagnosable]." Id., 1194. The Court rejected the contention that exposure alone was the triggering event and also rejected the contention that manifestation was the triggering event.
In sum, the insured would be permitted to establish that occurrences had taken place at any or all points from exposure to manifestation, on the ground that identifiable injuries had been proved to have occurred at each point to a reasonable degree of medical certainty. "In the pending case, we decide only that both states [New York and Texas] would rule that, at least where the evidence establishes a progressive bodily disease, with injury-in-fact recurring throughout the disease process, all policies in effect at any time during that process are triggered. . . . We therefore reject [the] position which limits injury-in-fact to the initial injury occurring at or shortly after exposure to asbestos, and [the] position which limits injury-in-fact to the time when the injury becomes either diagnosable or fully developed." Id., 1197.
The District Court's determination of proration among the insurers was not challenged on appeal. The Second Circuit Court of Appeals summarized the District Court's opinion on that issue. "Under this trigger of coverage, an asbestos-related bodily injury claim typically will implicate multiple policies in effect CT Page 5118 during the multi-year period of the injury process. Each of the triggered policies promised to pay `all sums' that [the insured] becomes liable to pay to the underlying claimants as a result of bodily injury occurring during the policy period. Thus, for any single asbestos-related bodily injury claim, there may be several policies each independently responsible under their explicit terms for paying `all sums' that [the insured] becomes liable to pay to the claimant." Id., 1201.
"Confronted with multiple insurance policies covering the same claim, the District Court decided, on motion for summary judgment, that the triggered policies' obligations were to be prorated based upon the policies' respective triggered time periods. Specifically, the District Court ruled that each triggered policy was responsible for only a pro rata share of [the insured's] liability to a particular claimant. The share was determined by multiplying the judgment or settlement by a fraction that has as its denominator the entire number of years of the claimants injury, and as its numerator the number of years within that period when the policy was in effect." Id., 1202.
The insured did appeal, however, from the District Court's ruling that to the extent the insured had no insurance (because it had been uninsured or its insurance had been consumed by prior payments) during any portion of the time period of a particular claimant's injury, the insured itself would be responsible for the pro rata share attributable to such period. That is, for "uninsured" periods, the insured would be treated as if it had issued itself an insurance policy and would be required to "contribute" accordingly. The Second Circuit Court of Appeals upheld the "proration-to-the-insured" approach as being a sensible way to adjust the competing contentions of the parties in the context of continuous triggering of multiple policies over an extended span of years. The Court did not agree, however, with the District Court's ruling that applied this approach to years after 1985 when asbestos liability insurance was no longer available. Id., 1203.
The other New York case, Prudential Lines, supra, is cited extensively by the plaintiff in support of its contention that joint and several liability is applicable in this instance. InPrudential Lines, the District Court held that each policy of the insurer was liable for all damages resulting from asbestos exposure, and liability would not be allocated among all triggered policies. In affirming the judgment of the District CT Page 5119 Court, the Second Circuit Court of Appeals noted in footnote 12 at page 84 of the opinion, that it had never addressed the allocation issue directly: "In Stonewall Insurance Co., the district court ruled that `each triggered policy was responsible for only a pro rata share of [the manufacturers] liability as to a particular claimant,' and this ruling was not challenged on appeal. . . . However, the insured in Stonewall did challenge the allocation of liability to itself when it was uninsured — what has been labelled `proration-to-the-insured.' We held that the district court did not err in allocating liability to the insured under this allocation formula for periods in which the insured lacked coverage (at least during the period when coverage for asbestos risk was available), noting that `proration-to-the-insured" is a sensible way to adjust the competing contentions of the parties in the context of continuous triggering of multiple policies over an extended span of years.'"
The Second Circuit Court of Appeals in Prudential Lines
reviewed cases from several jurisdictions on the issue of allocation among policies. "The courts that have endorsed allocation when the loss is paid have generally been motivated by considerations of equity and policy, rather than contract wording. First, the courts have sought to ensure that a single insurer underwriting a small proportion of the risk does not get saddled with the full loss, [citations omitted], a loss that may prove uncollectible from other companies. Second, courts enforce allocation to require the insured to absorb losses for periods when it was self-insured. . . . Third, these courts see allocation as the most efficient way to assign liability among policies, reasoning that any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and that it is more efficient to deal with these issues in a single proceeding." Id., 85.
The Second Circuit Court of Appeals noted the absence of those complicating factors in the Prudential Lines case. There were no periods of self-insurance and, for virtually the entire span of years, the insurer involved was Prudential's only insurer. Id., 85. Thus, the Court held that "in the circumstancespresented, Prudential has the right to demand that a policy pay fully coverage for each insurance claim in which the underlying claimant suffered asbestos exposure and therefore asbestos injury during the policy period." Id., 86.
New York courts have consistently held that insurers are only CT Page 5120 responsible for bodily injury that takes place during the policy period. Joint and several liability, even in situations involving subject policies with "all sums" provisions, has been rejected in favor of pro rata allocation to all periods in which injury or damage took place. This court agrees with the result reached inReichhold I and Reichhold II, supra, whereby Connecticut favors this pro rata allocation approach, as does New York.
Based on the foregoing, and given the court's conclusion that there are multiple occurrences, summary judgment enters in favor of the defendants. If damages are proved, the amount of such damages allocable to any year will be below $25 million, the lowest level required to reach the excess insurance coverage of any of these defendants.
Breach of Contract
According to the defendants, the plaintiff never tendered the underlying claims that are the subject of this dispute and the defendants did not disclaim coverage for these claims at any time prior to the filing of the lawsuit claiming breach of contract in October of 1985. The defendants are not contending that the plaintiff failed to adhere to policy language requirements, they simply maintain that without demand and repudiation, there was no breach of contract.
By resolving the issues of allocation and number of occurrences in favor of the defendants, this court finds as a matter of law that there is no breach of contract because the defendants have no liability as excess earners. For this reason, the court hereby enters summary judgment in favor of the defendants on the second count of the amended complaint.
Professional Services Exclusion
In view of the court's decision with respect to the issues of allocation, number of occurrences and breach of contract, it is not necessary to address the issue of the applicability of the professional services exclusion provisions, and all of the differing versions thereof, in the various insurance policies at issue in this case. It may well be, as plaintiff contends, that this is a fact-based issue ultimately appropriate for determination by jury, but, as stated previously, the court does not need to reach the issue. CT Page 5121
Conclusion
The court finds that each underlying claim for which Met Life seeks coverage from the defendants must be treated as a separate occurrence. The court further finds that any injuries or damages must be allocated on a pro rata basis. Given the amount paid per claim in the underlying actions, the amount of damages allocable to each year will be below $25 million, the lowest level required to reach the excess insurance coverage of any of the defendants. Because the defendants have no liability as excess carriers, there can be no breach of contract as a matter of law. Accordingly, the defendants' motions for summary judgment as to counts one and two of the amended complaint are granted.
Koletsky, J.