[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT
By motion for summary judgment dated August 28, 2000, defendant Mott Metallurgical Corporation (Mott) seeks judgment on both counts one and two of plaintiff Irene M. Rock's (Rock) revised complaint alleging intentional and negligent infliction of emotional distress respectively. Oral argument was heard by the court on October 10, 2000. Supplemental briefs were submitted by both parties thereafter. For the reasons stated below, the court grants the motion.
 I. PROCEDURAL BACKGROUND
Rock's revised complaint was filed on February 9, 1999. On June 9, 2000, the parties' counsel agreed to, and an attorney trial referee approved a discovery order that required any motions for summary judgment to be filed by September 1, 2000, and scheduled trial to commence on January 24, 2001. On August 28, 2000, Mott filed both a motion for permission to file a motion for summary judgment, pursuant to Practice Book § 17-44, and a motion for summary judgment. Rock filed no objection to the motion for permission. The court, Graham, J., granted the motion for permission on September 14, 2000.
The motion for summary judgment was accompanied by a memorandum of law, excerpts from the transcripts of two sessions of Rock's deposition (Exhibits 1 and 2), as well as copies of seven deposition exhibits including performance evaluations of Rock (Exhibits 3-6, 9) and warning CT Page 896 notices to Rock (Exhibits 7-8). On October 6, 2000, Rock filed her objection to the motion, accompanied by a memorandum of law, her affidavit, excerpts from the transcript of the deposition of Franklin B. Murphy and a copy of an exhibit from the deposition, a letter from Murphy to Mott's president.
At oral argument, Mott offered court reporter certificates to further authenticate the excerpts of Rock's deposition that were presented with the motion. Rock maintained her objection to the court's consideration of these excerpts, which was set forth in her Objection. The parties were then given permission by the court to file supplemental briefs. On October 19, 2000, Mott filed its reply memorandum of law accompanied by court reporter certificates as to the transcripts of the two sessions of Rock's deposition. Rock's sur-reply was filed on October 27, 2000.
 II. STANDARD OF REVIEW
Practice Book § 17-49 provides that summary judgment shall be granted "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) Home Ins. Co. v. Aetna Life Casualty Co.,235 Conn. 185, 202, 663 A.2d 1001 (1995). "Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. See Practice Book § [17-46]." Id., 202-203. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . .The test is whether a party would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) Sherwood v. Danbury Hospital,252 Conn. 193, 201, 746 A.2d 730 (2000).
"Summary judgment procedure, generally speaking, is an attempt to dispose of cases in a manner which is speedier and less expensive for all concerned than a full-dress trial." Orenstein v. Buckingham Corp.,205 Conn. 572, 574, 534 A.2d 1172 (1987). A "motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." Wilson v. New Haven,213 Conn. 277, 279, 567 A.2d 829 (1989).
"The movant must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." (Internal quotation marks omitted.) Miller v. UnitedTechnologies Corp., 233 Conn. 732, 751-752, 660 A.2d 810 (1995). While "the moving party has the burden of presenting evidence that shows the absence of any genuine issue of material fact, the opposing party must substantiate its adverse claim with evidence disclosing the existence of CT Page 897 such an issue." (Internal quotation marks omitted.) Burnham v. Karl Gelb. P.C., 50 Conn. App. 385, 387, 717 A.2d 811 (1998), aff'd,252 Conn. 153, 745 A.2d 178 (2000); Haesche v. Kissner, 229 Conn. 213,217, 640 A.2d 89 (1994). The opposing party must do more than merely assert the existence of a disputed issue of fact. See Burns v. HartfordHospital, 192 Conn. 451, 455, 472 A.2d 1257 (1984). Mere assertions cannot refute evidence properly presented to the court in support of a motion for summary judgment. See id. "To oppose a motion for summary judgment successfully the nonmovant must recite specific facts which contradict those stated in the movant's affidavits and documents." (Internal quotation marks omitted.) Connecticut National Bank v. GreatNeck Development Co., 215 Conn. 143, 148, 574 A.2d 1298 (1990). "[C]onclusory statements, in [an] affidavit and elsewhere . . . do not constitute evidence sufficient to establish the existence of disputed material facts." Gupta v. New Britain General Hospital, 239 Conn. 574,583, 687 A.2d 111 (1996).
 III. DISCUSSION A. Consideration of Deposition Excerpts
In her memorandum of law, Rock argues that the court should not consider the excerpts of her deposition testimony presented by Mott in support of the motion because they were not certified as required by the rules of practice. (See Rock Memorandum in Support of Objection to the Motion [Rock Memo.], October 6, 2000, pp. 3-4.) Section 17-45 provides that "[a] motion for summary judgment shall be supported by such documents as may be appropriate, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and the like." Rock also urges the court not to consider these excerpts even in the event that Mott subsequently presented court reporter certificates, claiming that to do so would violate the court's scheduling order. (See Rock Memo. at p. 4.)
For several reasons, the court has considered the transcript excerpts. When the court, Graham, J., granted Mott's motion for permission to file a motion for summary judgment after the September 1, 2000, deadline had passed, it approved consideration of the motion. At the time, the court had the proposed motion before it, including references to the deposition excerpts and the excerpts themselves. This court assumes that the purpose of granting permission was to allow the motion to be adjudicated on its merits, in keeping with the tenets of summary judgment procedure which were outlined above.
There is no dispute as to the accuracy of the excerpts from Rock's deposition testimony transcripts. At oral argument, the court inquired as CT Page 898 to whether the accuracy of the excerpts was at issue. In her sur-reply, which was submitted after the oral argument, Rock did not question the exhibits' authenticity. Instead, she stated, "it is possible that pages could be substituted for the original transcribed testimony." (Rock's Sur-Reply. October 27, 2000, p. 2.) It is evident to the court that, having been afforded a further opportunity to review the excerpts, Rock discovered no inaccuracies.
The excerpts of the deposition transcript included Rock's own signed acknowledgments of her testimony. Each acknowledgment was taken by her attorney, in his capacity as a commissioner of the Superior Court and included an errata sheet as well. This form of attestation is the same as that permitted by law for affidavits. See General Statutes § 1-24(2) (authorizes commissioners of the Superior Court to administer oaths).
While the rules of practice require "certified transcripts of testimony under oath," they do not specify from whom such certificates may be accepted. Practice Book § 17-45. The term "certified" is not defined. When a statute or rule does not expressly define a term, construction of it is to "comport with the plain and ordinary meaning of the word as it is used in common parlance." Peabody N.E., Inc. v.Department of Transportation, 250 Conn. 105, 122-123, 735 A.2d 782
(1999). In the absence of a definition for a term, our Supreme Court has looked to the dictionary definition, as set forth in Webster's Third New International Dictionary (Webster's), to ascertain its meaning. See id. Webster's defines "certified" as "endorsed authoritatively: guaranteed or attested as to quality, qualifications, fitness or validity." Webster's Third New International Dictionary.
In this case, Rock attested to the validity of the transcripts in the same fashion as she attested to the contents of her affidavit.[1] At oral argument, Mott offered to present the court with certificates by the court reporter who transcribed Rock's deposition. See Maryheart Crusadersv. Barry, Superior Court, judicial district of New Haven at Meriden, Docket No. 251647 (April 20, 1998, Dunnell, J.) (the court permitted the evidence of certification to be presented at short calendar). Additionally, Mott's reply was accompanied by exhibits A and B, copies of court reporter certificates which certify the accuracy of the transcripts. Rock acknowledges Mott's submission of copies of the certificates which accompanied the original transcript but contends that another certification of the actual pages submitted with the motion is required. (See Rock's Sur-Reply, p. 2.)
In the absence of any dispute as to the substance of the testimony and having reviewed two forms of certifications of the transcripts, executed by Rock herself and the transcribing reporter respectively, the court CT Page 899 finds no need for a third. The transcript excerpts have been "certified" in a manner which satisfies our rules of practice. Under these circumstances, the court has considered the exhibits that contain excerpts of Rock's deposition testimony.
It should be noted that both parties have submitted excerpts from depositions for the court's review. "While [Rock's] deposition testimony is not conclusive as a judicial admission; General Statutes § 52-200; it is sufficient to support entry of summary judgment in the absence of contradictory competent affidavits that establish a genuine issue as to a material fact." Collum v. Chapin, 40 Conn. App. 449, 450 n. 2, 671 A.2d 1329
(1996). See also Tryon v. North Branford, 58 Conn. App. 702, 716,755 A.2d 317 (2000) (court held in some instances a motion for summary judgment may be supported solely by deposition testimony).
 B. Intentional Infliction of Emotional Distress
In count one of the revised complaint, Rock alleges that she was employed by Mott in its shipping and receiving departments and in its stock room for five years, between November, 1993, and November, 1998. (See Revised Complaint, February 9, 1999, count one, ¶ 3.) Rock claimed that she was subjected to "humiliating, demeaning and verbal abuse" by her immediate supervisor, Patti Pare, and was subjected to unreasonable orders and requests "in a derogatory, insulting and demeaning manner."[2] (Revised Complaint, count one, ¶ 6.) After this "abuse," plaintiff complained to two of Pare's superiors, who, she alleges, "failed and refused to prevent further verbal abuse and demeaning and humiliating treatment." (Revised Complaint, count one, ¶ 7.) Rock further alleged that upon being told to "f — herself" by a co-employee, Pare told her that "such remarks were based on the fault of the plaintiff." (Expletive omitted.) (Revised Complaint, count one, ¶ 8.) On November 5, 1998, Rock was terminated from her employment. (Revised Complaint, count one, ¶ 9.)
Rock claims that she suffered."insult, humiliation, and embarrassment" as a result of Pare's treatment of her. (Revised Complaint, count one, ¶ 10.) In summary, she alleges that Mott's actions "were intentional, and the humiliation, ridicule, verbal abuse and insulting treatment constituted extreme and outrageous conduct, and inflicted upon the plaintiff severe emotional distress." (Revised Complaint, count one, ¶ 13.)
Our Supreme Court recently reiterated the elements which a plaintiff must prove in order to establish a claim for the intentional infliction of emotional distress. In Appleton v. Board of Education of Stonington,254 Conn. 205, 210, ___ A.2d ___ (2000), the Court restated the four CT Page 900 necessary elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . .Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . .Only where reasonable minds disagree does it become an issue for the jury." (Citations omitted; internal quotation marks omitted.) Id., 210.
"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id., 210-211. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!' . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Id., 211.
The court will address the evidence presented on the specific allegations set forth in count one of the Revised Complaint in the order in which they appear in that pleading.
1. Lifting and Carrying
Rock alleges that she was ordered to lift and carry heavy objects that were beyond her capacity. (See Revised Complaint, count one, ¶ 6(a).) Rock admitted in her deposition that she was never ordered to carry anything that was too heavy for her. (See Mott Exhibit 2, Rock Deposition [Rock Dep. 2], December 15, 1999, p. 215). While at times she carried heavy objects, either with a co-employee's help or with the use of equipment, none were beyond her capacity. (See Rock Dep. 2 at p. 216.) In actuality, although this was not alleged in the revised complaint, her complaint in this area is that she was doing more than her share of lifting and carrying as compared to other employees. (See Rock Dep. 2 at p. 216.) Rock did not submit any evidence on this topic to contradict the evidence presented by Mott in support of its motion. Additionally, the subject was not addressed in Rock's affidavit dated September 25, 2000.
2. Equipment and Materials
Rock next alleges that she was ordered to do work without being able to CT Page 901 use the necessary equipment and materials. (See Revised Complaint, ¶ 6(b).) Rock testified at her deposition that this problem was solved in advance of her termination when she obtained the necessary materials at a location suggested by her supervisor. (See Mott Exhibit 1, Rock Deposition [Rock Dep. 1], November 9, 1999, pp. 55-56.) She also testified that she spoke with Mott's plant manager concerning her complaint that she was treated rudely by co-workers when she wanted to use a computer or scale. (See Rock Dep. 1 at pp. 57-59.) She admitted that, by the end of 1997, these problems had stopped. (See Rock Dep. 1 at pp. 63-64; Rock Dep. 2 at p. 221.) As with the previous allegation, her affidavit did not address this subject.
3. Workstation
Rock alleges that she was transferred to a workstation without a chair or desk, requiring her to stand while others had desks and chairs. (See Revised Complaint, count one, ¶ 6(c)). The evidence before the court reveals that this too, was resolved. Rock testified that this problem began early in 1997, and lasted for about a year. (See Rock Dep. 2 at pp. 216-218.) Rock acknowledged that there was no reason for complaint concerning this aspect. (Rock Dep. at p. 222.) As with the previously discussed allegations, this subject was not addressed in Rock's affidavit.
4. Name-calling
Rock alleges that Pare referred to her as being "stupid." (Revised Complaint, count one, ¶ 6(d).) In her deposition, Rock stated that Pare did not call her "stupid"; (Rock Dep. 2 at p. 182.); but instead she claimed that Pare used the word "idiot" when referring to Rock and other employees' work habits. (See Rock Dep. 2 at p. 182.) Rock contended that such comments by Pare embarrassed and harassed her. (See Rock Dep. at pp. 184-185.) Pare allegedly used this word when she was pointing out an example of how Rock's work had allegedly been done incorrectly. (See Rock Dep. 2 at pp. 182-183.) According to Rock, this "happened a couple of times on occasion." (Rock Dep. 2 at p. 183.) Rock acknowledged that it was a legitimate function of a supervisor to try to prevent mistakes by pointing out past ones. (See Rock Dep. 2 at p. 184.) She also admitted making some mistakes and that pointing these out "might be instructive to the group if it's the sort of mistake that could be made by any employee. . . ." (Rock Dep. 2 at p. 184.)
In her affidavit, Rock stated that during the course of her employment, she "was insulted by Patti Pare, called stupid and lame brained, referred to as idiot, made the subject of ridicule by being used as an example of a poor employee, all of which humiliated [her] during CT Page 902 the course of [her] employment on a daily basis." (Rock affidavit, September 25, 2000, ¶ 5.) She alleges also that she continually reported her treatment to Pare's superiors. (See Rock affidavit, ¶ 6.) Further, she asserted that "[a]s a result of the daily humiliating treatment including being called names and being used as an example of a poor employee," she required medical attention. (Rock affidavit, ¶ 7.) The affidavit presents no specific examples of the claimed insulting and humiliating treatment, other than the three names as to which she claimed she was referred. The affidavit does not state that Pare called her by these names; it merely states that Pare insulted her. As noted above, she testified at her deposition that Pare referred to her on a couple of occasions as an "idiot," that Pare did not call her "stupid," and that the incidents in which she was cited as an example of a poor employee occurred "a couple of times," not on a daily basis.
5. False Accusation
Rock asserts that she "was falsely accused of not completing assigned tasks, and thereafter screamed at by her supervisor, Patti Pare." (Revised Complaint, count one, ¶ 6(e).) This allegation relates to a November 3, 1998, incident involving Rock and Pare, which occurred just prior to Rock's termination. Pare asked Rock to comment on Pare's critical 1998 evaluation of Rock which included several "unsatisfactory" ratings. (See Mott Exhibit 9.) According to Rock, when she told Pare that she had not had sufficient time to respond, Pare "got very angry and put her hand up in the air and started banging on her desk and screaming, "I want you to do it now,' and [threw] it at [her]." (Rock Dep. 1 at p. 162.) Rock admitted that she, too, was "probably upset and probably a little loud. . . ." (Rock Dep. 1 at p. 163.) This incident took place in Pare's office. (See Rock Dep. 1 at p. 162-163.)
Rock also complained that Pare screamed and yelled at her on a couple of occasions in 1998, when Rock brought what Pare considered to be minor matters to Pare's attention. (See Rock Dep. 2 at pp. 286-287.) According to Rock, she complained to Pare that Pare distributed work unfairly and favored certain co-workers of Rock over her. For example, she complained that on several occasions a co-worker would disappear and wind up in Pare's office for hours, leaving Rock to do work without help. (See Rock Dep. 1 at pp. 65, 67.) Rock testified that Pare told her this was not any of Rock's business. (See Rock Dep. 1 at p. 71.) Rock spoke to Pare about this issue on numerous occasions. (See Rock Dep. 1 at p. 75.) Pare repeatedly said that favoritism was not occurring and would not be tolerated. (See Rock Dep. 1 at pp. 82-83.) Rock's affidavit does not address this subject.
6. Profanity CT Page 903
Rock further alleges that a co-worker told her to "f___ herself' and that Pare told her that this was her own fault. (See Revised Complaint, count one, ¶ 8.) Rock's affidavit does not shed any light on this allegation. Her deposition testimony on this topic contradicts her pleading. Instead of claiming that Pare told Rock that the remark was Rock's fault, Rock testified that Pare said it was "petty," that it was a matter between Rock and the co-worker, that Rock's complaint was "hearsay," that Rock could not prove that it was said to her and there was nothing Pare could do about it. (See Rock Dep. 2 at p. 241-242.) Afterwards, Rock claimed Pare and the co-worker "started saying derogatory remarks towards me, about me, the both of them, laughing." (Rock Dep. 2 at pp. 239-240.) She also stated that the co-worker told her to "f___ herself' "a couple of times," but then corrected herself to say that it only occurred on that one occasion. (Rock Dep. 2 at p. 246.)
7. Termination
Rock's continuous complaints were referenced in Pare's annual written evaluations. In the 1995 evaluation, Pare stated that Rock "still needs to work on concentrating on her job rather than her co-workers." (Exhibit 4, Evaluation, 1995, p. 4.) In the 1996 evaluation, Pare noted again, "I would still like to see [Rock] pay more attention to her own work rather than her co-workers. I would like to have her try and resolve smaller problems on her own before involving others." (Exhibit 5, Evaluation, 1996, p. 4.) This sentiment was reiterated in the 1997 evaluation. (See Exhibit 6, Evaluation, 1997, p. 4.) By August, 1998, this problem was considered sufficiently serious to warrant giving Rock a written "Employee Warning Notice," wherein it was noted that Rock "[c]ontinues to worry about and complain about co-worker's work habits. Always questions work distribution when I assign work." (Exhibit 8, Employee Warning Notice, August, 1998.)
Pare and other members of management took various steps to address Rock's complaints. Pare held two group discussions in which she addressed the issue of favoritism. (See Rock Dep. 1 at pp. 78-80.) At Pare's request, Rock and Pare met with Mott's Director of Employee Relations to discuss work distribution and favoritism. (See Rock Dep. 1 at pp. 88-89.) At the end of that meeting, Rock stated that she believed that all of the employees could work together as a group. (See Rock Dep. 1 at p. 102.) Rock was presented with the opportunity to make suggestions, but did not do so. (See Rock Dep. 1 at pp. 99-102.) Another meeting with this supervisor followed the written warning referenced above. The supervisor agreed to investigate the situation and received Rock's assurance that she would accept the results of said investigation. (See Rock Dep. 1 at p. 105.) At another meeting, the supervisor accepted Pare's assessment CT Page 904 that work had not been distributed unevenly. (See Rock Dep. 1 at p. 106.) Yet another meeting with a different supervisor concerning the written warning also ended with the recommendation that the group should work together. (See Rock Dep. 1 at p. 137.) Notwithstanding the supervisors' responses, Rock continued to complain about work distribution. (See Rock Dep. 1 at p. 137.) Rock had no suggestion as to what supervisory personnel should do about the situation except for the use of surveillance cameras. (See Rock Dep. 1 at p. 139.)
Prior to being given her 1998 annual evaluation, Pare's supervisor orally informed Rock that she had been making a lot of mistakes. (See Rock Dep. 1 at p. 149.) Pare offered to show Rock statistics reflecting the number of mistakes Rock had made in comparison to other workers, but Rock chose not to look at them. (See Rock Dep. 1 at p. 150.) On November 2, 1998, Pare presented Rock with the 1998 Employee Performance Evaluation. (See Exhibit 9, Employee Performance Evaluation, 1998.) The evaluation stated that Rock's level of errors had increased to "an unacceptable amount," which was attributed in part to her continued concern about her co workers' activities. (Exhibit 9 at p. 4.) Pare stated in the evaluation that Rock "needs to do as she is asked to do without questioning why I'm having her do some[thing] and not someone else." (Exhibit 9 at p. 4.) Nevertheless, her overall rating was "Satisfactory." (Exhibit 9 at p. 4.)
The discussion of this evaluation that ensued on November 3, 1998, was the "loud" meeting addressed above. Following the meeting, Rock went to see Mott's President, Roger Klene. (See Rock Dep. 1 at p. 164.) Rock reiterated her complaints about what she termed "harassment." (See Rock Dep. 1 at p. 166.) From Klene's office, she went to Judy Travers' office, Mott's Director of Employee Relations, with whom she had previously discussed her problems regarding Pare's methods. (See Rock Dep. 1 at p. 178.)
Pare's supervisor called her at home on the next morning, November 4, 1998, and told her to enter Mott's premises through the front door, not by the employees' entrance, when she came in to work. (See Rock Dep. 2 at p. 189.) At work, she "was still quite upset that morning" and was told by Pare's supervisor to take the rest of the day off. (Rock Dep. 2 at p. 190.)
The next day, November 5, 1998, Rock came to work and parked her car in the executive area near the front door. (See Rock Dep. 1 at p. 18.) Soon thereafter, she met with supervisory personnel in an area away from her co-employees, whom she did not see. (See Rock Dep. 1 at p. 18.) Present were Pare's supervisor, who was the assistant plant manager; Art Sorensen, the plant manager; and Travers. Sorensen informed Rock that she CT Page 905 was being discharged. (See Rock Dep. 1 at pp. 9-10.) The meeting lasted ten minutes and no one raised their voice. (See Rock Dep. 1 at p. 14.) Rock was provided with some papers related to her termination and was escorted to her car at the end of the meeting. (See Rock Dep. 1 at pp. 16-17.) In the process, she did not go through the employee work area and did not come into contact with her co-employees. (See Rock Dep. 1 at p. 18.) Nothing unusual or embarrassing occurred in connection with her leaving the building. (See Rock Dep. 1 at pp. 18-19.) Rock's affidavit does not reference the termination process.
Rock's objection to the motion also relies on the deposition testimony of Rock's former co-worker, Franklin B. Murphy, excerpts of which were presented to the court.[3] Murphy stated that Pare engaged in "hollering" at Rock. (Deposition of Franklin B. Murphy [Murphy Dep.], June 6, 2000, pp. 66, 68.) Murphy also stated that Pare treated other employees similarly. (See Murphy Dep. at p. 68.) He stated that Pare referred to Rock and another worker as "stupid, lame-brained idiots." (Murphy Dep. at pp. 69, 72.) According to Murphy, Pare engaged in name-calling "on the average of three or four times a week." (Murphy Dep. at p. 126.) This directly contradicts Rock's deposition testimony that this happened only "a couple of times on occasion." (Rock Dep. 2 at p. 183.) Murphy never heard Pare use profanity towards Rock or other employees. (See Murphy Dep. at p. 141.) Murphy testified that Rock told him that Pare and a co-worker had made fun of her, "saying that she had to be on medication to do this job." (Murphy Dep. at p. 143.)
Rock also presented the following excerpt from Murphy's deposition for the court's consideration:
 "Q: Sir, can you — could you attach any word to describe the treatment of [Rock] by her superior [Pare]?
Q: Can you, sir?
A: I would just — I would term it outrageous, from what I saw."
(Objection omitted.) (Murphy Dep. at p. 89.) The court finds that this opinion must be disregarded as an expression of a conclusory statement. See Gupta v. New Britain General Hospital, 239 Conn. 574, 583, 687 A.2d 111
(1996) (the court found a plaintiff's conclusory statements to be insufficient to establish the existence of disputed material facts).
As a whole, the conduct described in the documents presented was less than "extreme" and "outrageous" in nature. The conduct was less serious CT Page 906 than or equivalent to that which was deemed insufficient to sustain a claim for the intentional infliction of emotional distress in several recent cases involving somewhat similar conduct. For example, Appleton
involved "condescending comments to [a plaintiff] in front of [her] fellow colleagues" in which the plaintiff's ability was questioned.Appleton v. Board of Education of Stonington, supra, 254 Conn. 211. The Supreme Court stated, "[t]hese occurrences may very well have been distressing and hurtful to the plaintiff. They do not, however, constitute extreme and outrageous conduct. . . ." Id.
Likewise, in DeLeon v. Little, 981 F. Sup. 728 (D.Conn. 1997), the court found the following factual allegations concerning the plaintiff's supervisor insufficient: "Defendant's alleged outrageous conduct includes her orders to purchase drugs, orders to stand guard while Defendant ingested illegal drugs, orders to perform personal errands, orders to perform tasks for a private employer, repeated telephone calls to Plaintiff at her home, threats to terminate Plaintiff's employment and replace her with an individual of another race, implementation of discriminatory sick time policies, monitoring of attendance at work, and repeated degrading and humiliating criticism of Plaintiff in the presence of others." Id., 738 n. 8. The court concluded that "[w]hile Defendant's alleged conduct may have been rude, inappropriate, or even criminal, it does not rise to the level of extreme and outrageous as required by Connecticut common law." Id.
Similarly, in Scandura v. Friendly Ice Cream Corporation, Docket No. 529109, Superior Court, 1996 WL409337 (Conn.Super. June 27, 1996,Sullivan, Dorsey, Walsh and Sheldon, Js.), plaintiff alleged that her supervisor engaged in extreme and outrageous conduct "by making her furnish daily sales projections for the restaurant she managed, disallowing her from taking a scheduled vacation for which she had already made airline reservations, and ridiculing her, `unjustifiably, . . . often obscenely,' and in a manner which insulted her integrity, both before and after he learned that she suffered from a medical condition that made her particularly susceptible to emotional distress." Id. In addition, she alleged that another supervisor worsened the effects, "first by forcing the plaintiff to share her job duties with another person, then by demoting her after telling her that she was not a "manager of the 90's.'" Id.
"The initial supervisor sharply criticized plaintiff's job performance. On more than one occasion he termed plaintiff's staff "f________ lunatics." (Expletive omitted; internal quotation marks omitted.) Id. Additionally, he referred to the plaintiff as "incompetent" and "out of her league." (Internal quotation marks omitted.) Id. The court noted that in plaintiff's own affidavit in opposition to the motion CT Page 907 for summary judgment, "she avers that in the wake of her psychiatric difficulties, leave of absence and return to work, [her supervisor] told her on one occasion that she was `playing games' with her health problems." Id. While the court noted that the supervisor's conduct may have been wrong, crude, and unkind, "it can hardly be argued that this conduct was so atrocious or outrageous as to be actionable as intentional infliction of emotional distress. Criticism of employee job performance . . . is an expected, albeit unwelcome and uncomfortable, part of every employee's working life." Id.
A similar result occurred in Valencia v. St. Francis Hospital andMedical Center, judicial district of Hartford-New Britain at Hartford, Docket No. 538867 (April 3, 1996, Hennessey, J.). where the plaintiff alleged that "a critical performance evaluation written by her supervisor . . . spawned a combative and acrimonious relationship between the women." Id. Plaintiff alleged that she was physically and verbally assaulted by her supervisor. See id. The plaintiff alleged that the supervisor "grabbed plaintiff's arm in front of patients and co-workers, pulled her in a back room and yelled at her." (Internal quotation marks omitted.) The court concluded "that the defendant's conduct and the plaintiff's resulting distress [we]re insufficient as a matter of law to satisfy the requisite elements for this claim." Id.
In her objection, the plaintiff refers the court to Ferraro v. The Stop Shop Supermarket Co., judicial district of New Haven, Docket No. 388031 (May 24, 2000, Silbert, J.), wherein the court noted that "[p]atterns of behavior as well as independent acts may satisfy the requirement for extreme and outrageous conduct." In that case, the plaintiff alleged that his supervisor's "harassment was public, continuous, extreme and unrelenting" and occurred in the presence of coworkers. Id. After reviewing the allegations, the court concluded that "most of the actions cited by the plaintiff d[id] not, at least individually; rise to the level of extreme and outrageous conduct." Id. Nevertheless, the court did not grant summary judgment, based on an alleged incident involving potential violence. The court stated, "[o]n one occasion, [the supervisor] threw a piece of meat at the plaintiff, while the plaintiff was at the meat cutting bench, butcher knife in hand, cutting meat. `I'm on the bench . . . [D'Errico] swing[s] this piece of meat at me, fling[s] it in the air, throw[s] it on the bench at me while I'm cutting meat on the bench[.] I'm cutting now. I have a knife in my hand.' The plaintiff allege[d] that he was deeply distressed by the likelihood of his sustaining a severe injury by being cut with the knife." Id. In denying summary judgment, the court noted that it was "troubled by the allegation that [the supervisor] threw a piece of meat at [plaintiff] while the plaintiff was working at the cutting table with a knife." Id. CT Page 908
In contrast, Rock's complaint alleges no fear of violence or threat of severe injury. Her claim that Pare threw the 1998 evaluation at her in their meeting concerning it pales in comparison.
Rock argues in her objection that her deposition testimony reflects "only that portion of her story entirely circumscribed by the limited questioning of defendant's counsel" and that she should be given an opportunity to present her story in full, and at such time she will present facts sufficient to convince a jury that her treatment at the defendant's place of employ was extreme and outrageous." (See Rock Memo. at p. 8.) Practice Book § 17-45 afforded Rock the opportunity to "present opposing affidavits and other available documentary evidence" in opposition to the motion.
Viewed in its most favorable light, the evidence provided by Rock concerning the intentional infliction of emotional distress, in opposition to the motion, does not create a genuine issue as to any material issue of fact. In essence, the evidence before the court amounts to an employee's complaint about a continuing series of insulting remarks and "hollering" by her supervisor, coupled with a meeting in the supervisor's office in which her supervisor allegedly became exasperated by the employee's delay in responding to a negative evaluation and threw the evaluation at her. As to the other aspects of the claim as pleaded, Rock's own testimony exposes their lack of substance and her affidavit in opposition provides no specific facts to support them. Moreover, her claims of unequal work distribution and favoritism are not the sort of "atrocious and utterly intolerable" behavior which is necessary to support this cause of action. As a result, the conduct alleged is insufficient as a matter of law to meet the standard of "extreme" and "outrageous" conduct which is required in order to sustain a claim for the intentional infliction of emotional distress. There is no genuine issue as to any material fact. Accordingly, summary judgment is granted as to count one of the plaintiff's revised complaint.
 C. Negligent Infliction of Emotional Distress
Count two of the revised complaint is premised on a claim for the negligent infliction of emotional distress. This count incorporates the factual allegations of the previous count and further alleges that Mott "should have realized that its actions involved an unreasonable risk of humiliating, ridiculing and verbally abusing Rock, causing emotional distress, and that such distress, if it were caused, might result in illness or emotional harm." (Revised Complaint, count two ¶ 14.)
Noting the authority cited by Mott in support of the motion, which requires that claims of this type must be based on conduct which occurred CT Page 909 in the termination process, Rock argues that "[g]iven the fact that the conduct of Patti Pare constituted a pattern of behavior which, in toto, amount to extreme and outrageous treatment, resulting in termination of employment, it is submitted the pattern of conduct in itself is inextricably a part of the termination process. . . . [T]he termination itself cannot be treated in isolation apart from the pattern engaged in by Patti Pare." (Rock Memo. at pp. 9-10.)
The only reference to the termination contained in count two is in paragraph nine, which states that Mott terminated Rock's employment on November 5, 1998. Rock's affidavit does not address termination at all. Rock's deposition testimony reflects a business-like and uneventful termination occurring on November 5, 1998. (See Rock Depo. 1. at pp. 9-14.)
Our Supreme Court has stated that "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." (Internal quotation marks omitted.) Parsons v. United TechnologiesCorp., 243 Conn. 66, 88, 700 A.2d 655 (1997). The concept advanced by Rock, that the termination process should be seen to encompass a pattern of events which led to termination, has been squarely rejected by the Superior Court and the United States District Court for the district of Connecticut. See Taylor v. Southern New England Telephone Co., judicial district of New Haven at New Haven, No. 03988 (Dec. 24, 1998, Jones, J.) (claim based on allegations of "abusive and hypercritical" treatment by supervisor failed because conduct did not occur in the termination process); Ferraro v. The Stop Shop Supermarket Co., supra; Fonseca v.RBC Heim Bearings Corp., 87 F. Sup.2d 137, 139-140 (D.Conn. 2000). InCowen v. Federal Express Corp., 25 F. Sup.2d 33, 40 (D.Conn. 1998), the court addressed a similar argument, stating that the plaintiff "base [d] this claim on allegations that Federal Express employees `fabricated a paper trail' in an effort to cause his termination. Contrary to Cowen's argument, the Connecticut Supreme Court did not recognize a claim for negligent infliction of emotional distress to redress unreasonable conduct in the employment relationship as a whole, but instead held that such a claim must be based on unreasonable conduct in the termination process." (Italics in original.) See Brown v. Nationscredit CommercialCorp., Docket No. 592EBB, 2000 WL 306947, 4 (D.Conn. 2000) ("[T]he Connecticut courts have uniformly held that the extreme and outrageous conduct must take place in the termination process itself and not the alleged ongoing campaign as asserted by Plaintiffs."); see also Thomasv. Saint Francis Hospital and Medical Center, 990 F. Sup. 81, 92
(D.Conn. 1998), aff'd, 198 F.3d 235 (2nd Cir.(Conn.) Sept. 28, 1998) (plaintiff failed to produce any evidence, beyond the allegedly wrongful termination, that defendant acted unreasonably on the day of her termination). CT Page 910
Thus, Rock's allegations concerning Pare's pre-termination "pattern of behavior" are insufficient as a matter of law to support a claim for the negligent infliction of emotional distress. No material fact is in dispute as to count two and Mott, therefore, is entitled to summary judgment.
 CONCLUSION
Based on the foregoing, the defendant's motion for summary judgment is granted as to both counts of the Revised Complaint. It is so ordered.
BY THE COURT,
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT